SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**States Newsroom Inc. v. City of Jersey City (A-25-24) (089943)**

**Argued April 29, 2025 -- Decided August 4, 2025**

**WAINER APTER, J., writing for a unanimous Court.**

In this appeal, the Court considers whether the expungement statute, N.J.S.A. 2C:52-1 to -32.1, bars release of a Jersey City Police Department (JCPD) internal affairs (IA) report regarding a JCPD lieutenant who was suspended for ninety days after discharging a shotgun at his home. Plaintiff States Newsroom Inc., publishing as the New Jersey Monitor, seeks access to the IA report under the common law.

In August 2019, a JCPD lieutenant and his girlfriend hosted a gathering and then argued about the leftover food and drink. The lieutenant fired a shot in the direction of his girlfriend and her son. He was arrested and charged with terroristic threats and possession of a weapon for an unlawful purpose. He pled guilty to a lesser charge and enrolled in a twelve-month pre-trial intervention program.

The JCPD opened an IA investigation and requested records from the State Police and Sussex County Prosecutor's Office (SCPO) about the incident. The JCPD ultimately sustained a finding of misconduct against the lieutenant and suspended him for ninety days. Counsel for defendants certified that the IA report "contains several pages worth of passages copied verbatim or nearly-verbatim" from State Police and SCPO records regarding the lieutenant.

Following the issuance and affirmance of two Attorney General Directives amending the Internal Affairs Policy and Procedures (IAPP) to require law enforcement agencies to publish "the names of law enforcement officers who commit disciplinary violations that result in the imposition of 'major discipline,'" see In re Att'y Gen. L. Enf't Directive Nos. 2020-5 & 2020-6, 246 N.J. 462, 472 (2021), the JCPD amended the report to identify the lieutenant by name but truncated its description of the incident. In an unrelated murder case in which the lieutenant had responded to the scene, the Hudson County Prosecutor's Office publicly filed the State Police and SCPO records from the August 2019 incident as potentially exculpatory material. Plaintiff obtained those records from the public docket and ran an article describing the August 2019 incident and accusing the JCPD of "work[ing] hard to hide the incident" by deleting details.

1

In March 2022, the Court held in an unrelated case that IA reports "can and should be disclosed under the common law right of access when interests that favor disclosure outweigh concerns for confidentiality." Rivera v. Union Cnty. Prosecutors' Off., 250 N.J. 124, 135 (2022). Four days later, plaintiff filed a request "under the Common Law Right of Access and Open Public Records Act (OPRA)" for "[c]opies of the internal affairs investigation reports relating to" the lieutenant's "8/18/2019 incident." Defendants denied the request, stating that internal affairs materials were confidential under the 2021 IAPP and were thus exempt from disclosure under OPRA. The denial did not address the common law or Rivera.

Plaintiff repeated its request for access under the common law. Defendants again denied the request, this time concluding that under the factors set forth in Loigman v. Kimmelman, 102 N.J. 98 (1986), and Rivera, "the municipal interest against disclosure outweighs the public interest in disclosure in this particular case." Plaintiff sued, seeking access to the IA report under Rivera. While the civil case was pending, the lieutenant secured a criminal records expungement pursuant to N.J.S.A. 2C:52-1 et seq. The August 30, 2022 expungement order issued by the Sussex County Superior Court directed the listed court and law enforcement agencies to "remove from their records all information relating to [the lieutenant's]" August 2019 arrest and criminal charges. It also directed those entities to "remove all records concerning the subsequent criminal . . . proceedings regarding such charge(s), including any conviction(s) . . . or disposition(s), if applicable."

The trial court denied plaintiff access to the IA report and ordered the entire docket to remain permanently sealed. The Appellate Division reversed and remanded as to both the IA report and the sealing of court documents. The appellate court read the good cause exception in N.J.S.A. 2C:52-19, which the parties had not raised, to require the trial court to "analyze[] the facts of this case by applying Loigman and Rivera." As to the sealing of court documents, the Appellate Division concluded the trial court "should not have sealed the entire file without finding good cause to overcome the strong presumption of public access to court records." It directed the court, on remand, to undertake the analysis required by Rules 1:2-1(c) and 1:38-11 and Hammock v. Hoffmann-LaRoche, Inc., 142 N.J. 356, 380-83 (1995), "before deciding whether to seal" any specific document. The Court granted certification. 259 N.J. 502 (2025).

**HELD:** The expungement statute does not bar release of the report because the IA report is not a criminal record. The expungement statute and the expungement order entered by the Sussex County Superior Court do, however, bar release of any information related to the lieutenant's arrest, conviction, or the disposition of his criminal case. Counsel for defendants has certified that the IA report in this case contains "information pertaining to [the lieutenant's] arrest, charges and [the] disposition" of his criminal case. Therefore, pursuant to the expungement statute

2

and order, any such information must be redacted from the IA report.  The Court affirms but modifies the Appellate Division's judgment.  It remands to the trial court to perform those redactions in camera and to then conduct the common law balancing test set forth in Rivera on the remainder of the IA report.  If the court finds that the "interests that favor disclosure outweigh concerns for confidentiality," Rivera, 250 N.J. at 135, it must redact the additional information specified in Rivera, id. at 150, and then release the redacted report to plaintiff.  As to the sealing of court documents, the Court leaves undisturbed the Appellate Division's direction.

1.  The Court reviews in detail key provisions of the expungement statute, including the protective provisions in N.J.S.A. 2C:52-15(a) and -30, on which defendants most heavily rely.  The Court explains that the statute contains several exceptions enumerating when expunged records may continue to be used.  Taken together, the exceptions underscore that the relief provided by the expungement statute does not include the wholesale rewriting of history.  Although the expungement statute generally permits a person whose record has been expunged to misrepresent his past, it does not impose a regime of silence on those who know the truth.  (pp. 15-19)

2.  The Court reviews the purpose and certain provisions of the IAPP.  For many years, both before and after 1996, the IAPP provided that the results of IA investigations were "confidential information" that could only be "released or shared" under specific circumstances.  In Rivera, the Court held that because the IAPP's confidentiality provisions were a grant of confidentiality established by the executive and "effectively recognize[d]" by the Legislature in 1996, when it enacted a statute requiring every law enforcement agency to adopt IAPP-compliant guidelines, IA reports were exempt from public disclosure under OPRA.  250 N.J. at 141-43.  However, the Court held that IA reports "can and should be disclosed under the common law right of access when interests that favor disclosure outweigh concerns for confidentiality."  Id. at 135.  The Court recognized that the six factors set forth in Loigman "focus[ed] primarily on the State's interest in preventing disclosure" and therefore set forth five additional factors that may "heighten[]" the public interest in disclosure of IA reports.  Id. at 144, 147-48.  The Court in Rivera noted that trial courts can "best assess any potentially legitimate confidentiality concerns by reviewing the [IA] report in camera and making appropriate redactions," and it listed information that should be redacted, at a minimum.  Id. at 150.  After Rivera, the Attorney General amended the IAPP to require that a new IA "Summary and Conclusions Report" be prepared and be disclosed to "any member of the public or press" "under the common law right of access" in certain circumstances after a significant amount of information is redacted.  (pp. 19-25)

3.  Internal affairs reports are not themselves "records . . . concerning a person's detection, apprehension, arrest, detention, trial or disposition of an offense within the criminal justice system."  N.J.S.A. 2C:52-1(a).  They are not "complaints,

3

warrants, arrests, commitments, processing records, fingerprints, photographs, index cards, 'rap sheets' and judicial docket records." Id. at -1(b). They are therefore not themselves "[e]xpunged." Ibid. The JCPD, however, is a "law enforcement . . . agency." Id. at -1(a). Therefore, any expunged records it possesses "concerning a person's detection, apprehension, arrest, detention, trial or disposition of an offense within the criminal justice system" must be "extract[ed], seal[ed], impound[ed], or isolat[ed]." Ibid. That would include any "complaints, warrants, arrests, commitments, processing records, fingerprints," and other materials specified in N.J.S.A. 2C:52-1(b) that the JCPD received from the State Police or the SCPO. Further, N.J.S.A. 2C:52-15 and -30 require the JCPD to (1) remove all criminal records specified in the August 30, 2022 expungement order from its files; (2) "ensure that such records or the information contained therein" about the expunged arrest, conviction, or related proceedings are not "released for any reason and are not utilized or referred to for any purpose"; (3) reply that there is "no record information" in response to a request "for information or records" about an expunged "arrest, conviction, or related proceedings"; and (4) refrain from revealing "the existence" of the expunged arrest, conviction, or related legal proceeding. The JCPD need not, however, refrain from revealing information about the underlying incident that led to both the lieutenant's arrest and its IA investigation. And it need not refrain from revealing information about its IA investigation into whether JCPD rules or regulations were violated. For those reasons, the expungement statute does not categorically bar the release of IA reports. The expungement order in this case likewise did not categorically bar disclosure of the requested IA report. However, once the JCPD became aware of the order, both the statute and the order barred and continue to bar defendants from releasing any information about the lieutenant's expunged arrest, conviction, or any related criminal proceeding. (pp. 25-31)

4. The Court explains why it rejects the argument that even if the expungement statute expressly prohibits JCPD from releasing any information about the lieutenant's expunged arrest, conviction, or related proceeding, a court could still order such information released if the common law "balancing weigh[ed] in favor of disclosure." Statutes are not subservient to the common law when the two are in conflict with each other. The expungement statute bars a law enforcement agency from releasing any information that would reveal an arrest, conviction, or related proceeding that it knows has been expunged. The Court must respect and enforce the Legislature's judgment. (pp. 31-34)

**AFFIRMED AS MODIFIED and REMANDED to the trial court.**

**JUSTICES PATTERSON, PIERRE-LOUIS, FASCIALE, NORIEGA, and HOFFMAN join in JUSTICE WAINER APTER's opinion. CHIEF JUSTICE RABNER did not participate.**

SUPREME COURT OF NEW JERSEY
A-25 September Term 2024
089943

States Newsroom Inc., a
foreign Nonprofit corporation
d/b/a New Jersey Monitor,

Plaintiff-Respondent,

v.

City of Jersey City and
Sean Gallagher
in his official capacity as
Records Custodian,

Defendants-Appellants,

and

Jersey City Police Superior
Officers Association,

Defendant/Intervenor.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| April 29, 2025 | August 4, 2025 |

Jeremy Jacobsen, Assistant Corporation Counsel, argued
the cause for appellants (Brittany M. Murray, Acting
Corporation Counsel, Jersey City Law Department,
attorneys; Jeremy Jacobsen, on the briefs).

CJ Griffin argued the cause for respondent (Pashman Stein Walder Hayden, attorneys; CJ Griffin, on the briefs).

Michael S. Carucci argued the cause for amicus curiae Municipal Clerks' Association of New Jersey, Inc. (Sills Cummis & Gross, attorneys; Michael S. Carucci and Thomas H. Prol, of counsel and on the brief).

Viviana M. Hanley, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; Jeremy M. Feigenbaum, Solicitor General, Michael L. Zuckerman, Deputy Solicitor General, and Sookie Bae-Park, Sara M. Gregory, and Raymond R. Chance, III, Assistant Attorneys General, of counsel, and Viviana M. Hanley, Emily M. Bisnauth, Elizabeth Kern, and Daniel W. Knox, Deputy Attorneys General, on the brief).

Michael R. Noveck, Deputy Public Defender, argued the cause for amicus curiae Public Defender of New Jersey (Jennifer N. Sellitti, Public Defender, attorney; Michael R. Noveck, of counsel and on the brief).

Markiana J. Julceus submitted a letter in lieu of a brief on behalf of amicus curiae American Civil Liberties Union of New Jersey (Lowenstein Sandler, attorneys; Markiana J. Julceus, on the letter).

Carl R. Woodward, III, submitted a brief on behalf of amici curiae New Jersey State League of Municipalities and New Jersey Institute of Local Government Attorneys (Carella, Byrne, Cecchi, Olstein, Brody & Agnello, attorneys; Carl R. Woodward, III, on the brief).

JUSTICE WAINER APTER delivered the opinion of the Court.

2

Plaintiff States Newsroom Inc., publishing as the New Jersey Monitor, seeks access under the common law to a Jersey City Police Department (JCPD) internal affairs (IA) report regarding a JCPD lieutenant who was suspended for ninety days after discharging a shotgun at his home. The lieutenant was arrested and charged with terroristic threats and possession of a weapon for an unlawful purpose. He pled guilty to a lesser offense and completed a pre-trial intervention (PTI) program.

The JCPD was not involved in the criminal proceedings against the lieutenant. However, as part of its IA investigation, it obtained the lieutenant's criminal records from two law enforcement agencies that were. The JCPD's attorney certified that the IA report, which is not in the record and has not been reviewed by any court, contains "a significant amount of information pertaining to [the lieutenant's] arrest, charges and disposition" copied from those agencies' records.

After our decision in Rivera v. Union County Prosecutors' Office, 250 N.J. 124 (2022), plaintiff sued the City of Jersey City and its records custodian (defendants) to obtain the IA report. While this case was pending, the lieutenant obtained a criminal records expungement from the Sussex County Superior Court.

3

The JCPD was not listed on the expungement order. It contends, however, that the expungement statute, N.J.S.A. 2C:52-1 to -32.1, bars release of the IA report. We disagree. The expungement statute does not bar release of the report because the IA report is not a criminal record. The expungement statute and the expungement order entered by the Sussex County Superior Court do, however, bar release of any information related to the lieutenant's arrest, conviction, or the disposition of his criminal case. Therefore, pursuant to the expungement statute and order, any such information must be redacted from the IA report.

We affirm but modify the Appellate Division's judgment. We remand to the trial court to perform those redactions and to then conduct the common law balancing test set forth in Rivera on the remainder of the IA report. If the court finds that the "interests that favor disclosure outweigh concerns for confidentiality," Rivera, 250 N.J. at 135, it must redact the additional information specified in Rivera, id. at 150, and then release the redacted report to plaintiff. As to the sealing of court documents, we leave undisturbed the Appellate Division's direction to the trial court to undertake the document-by-document analysis required by Hammock v. Hoffmann-LaRoche, Inc., 142 N.J. 356, 380-83 (1995), before deciding that any document must be sealed.

## I.

In August 2019, a JCPD lieutenant and his girlfriend hosted a pig roast at their home.[1] The lieutenant consumed six to eight beers. He and his girlfriend argued about what to do with the leftover food and drink. After stating, "Today is your day," the lieutenant retrieved his shotgun from his safe. As his girlfriend walked her son to the car, the lieutenant fired one round in their direction. One witness recounted that she heard the lieutenant say, "It's time to die."

The New Jersey State Police responded to the scene and arrested the lieutenant. He was charged with terroristic threats and possession of a weapon for an unlawful purpose, a Graves Act offense. On March 2, 2020, with the consent of the Sussex County Prosecutor's Office (SCPO), the lieutenant was permitted to plead guilty to a lesser charge and enroll in a twelve-month PTI program.

The JCPD was not involved in the criminal proceedings. However, it opened an IA investigation into the lieutenant's conduct. As part of that investigation, the JCPD requested records from the State Police and SCPO about the incident. The JCPD ultimately sustained a finding of misconduct

---

[1] Because we disclose information about the lieutenant's arrest, conviction, and related proceedings, we do not use the lieutenant's name or identifying information in this opinion.

against the lieutenant and suspended him for ninety days. Counsel for defendants certified that the IA report "contains several pages worth of passages copied verbatim or nearly-verbatim" from State Police and SCPO records regarding the lieutenant.

In June 2020, the Attorney General issued two Directives amending the Internal Affairs Policy and Procedures (IAPP) to require law enforcement agencies to publish "the names of law enforcement officers who commit disciplinary violations that result in the imposition of 'major discipline' -- termination, demotion, or a suspension of more than five days." In re Att'y Gen. L. Enf't Directive Nos. 2020-5 & 2020-6 (In re Directives), 246 N.J. 462, 472 (2021); see also 2020 IAPP § 9.11.2. Several groups representing law enforcement officers sued. In re Directives, 246 N.J. at 474.

While the Directives were temporarily stayed, the JCPD published an anonymized description of the August 2019 incident. It reads:

> A member of this agency while off duty retrieved a firearm after consuming 6-8 beers. He negligently discharged a round from the firearm during a dispute. The New Jersey State Police responded and their investigation resulted in his arrest and subsequent placement in Pre-Trial Intervention. Finding: Sustained[;] Penalty: Suspension 19 days[;] Loss of 71 days[;] Total Loss 90 day[s].

6

After we upheld the Directives in In re Directives, the JCPD amended the report to identify the lieutenant by name.  The JCPD, however, truncated its description of the incident:

> Lt. . . . lost a total of 90 days for violating JCPD Rules and Regulations for[:]   Conduct, Mishandling of a Firearm, Intoxicants Off Duty.  Lt. . . . negligently discharged a firearm while off duty and on his personal property.  [Final Notice of Disciplinary Action]:  Issue date 6/15/2020

In an unrelated murder case in which the lieutenant had responded to the scene, the Hudson County Prosecutor's Office (HCPO) publicly filed the State Police and SCPO records from the August 2019 incident as potentially exculpatory material under Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972).  After plaintiff obtained those records from the public docket, it ran an article describing the August 2019 incident and alleging that the "system [had] failed."  It accused the JCPD of "work[ing] hard to hide the incident" by deleting details it had initially provided in its 2020 major discipline report.  It also raised concerns that "the secrecy of police discipline records" had led police misbehavior to go "unnoticed -- and therefore possibly unchecked."

In March 2022, we held that IA reports "can and should be disclosed under the common law right of access when interests that favor disclosure outweigh concerns for confidentiality."  Rivera, 250 N.J. at 135.  Four days

7

later, plaintiff filed a request "under the Common Law Right of Access and Open Public Records Act (OPRA)" for "[c]opies of the internal affairs investigation reports relating to" the lieutenant's "8/18/2019 incident." Defendants denied the request, stating that internal affairs materials were confidential under the 2021 IAPP and were thus exempt from disclosure under OPRA. Defendants' denial did not address the common law or our decision in Rivera.

Plaintiff repeated its request for access under the common law. Defendants again denied the request, this time concluding that under the factors set forth in Loigman v. Kimmelman, 102 N.J. 98 (1986), and Rivera, "the municipal interest against disclosure outweighs the public interest in disclosure in this particular case." Defendants distinguished Rivera on the basis that "the misconduct alleged here does not implicate concerns of public trust related to bias or dishonesty, and . . . the public employee holds a significantly lower position" than did the police director in Rivera.

Plaintiff sued, seeking access to the IA report under Rivera. The trial court granted leave to the Jersey City Police Superior Officers Association (JCPSOA) to intervene as a defendant.

The lieutenant certified to the court that he had been "repeatedly assured" that the IA investigation "would be kept confidential" and that his

8

decision to accept the ninety-day suspension was "fundamentally based on this assurance." He argued that disclosure of the IA report would be an "embarrassment" to his family, would "undermine" his ability to supervise his subordinates, and would adversely affect his mental health.

While the civil case was pending, the lieutenant secured a criminal records expungement pursuant to N.J.S.A. 2C:52-1 et seq. The August 30, 2022 expungement order issued by the Sussex County Superior Court directed the Attorney General, the Superintendent of the State Police Expungement Unit, the Sussex County Prosecutor, and other specified court and law enforcement agencies to "remove from their records all information relating to [the lieutenant's]" August 2019 arrest and criminal charges. It also directed those entities to "remove all records concerning the subsequent criminal . . . proceedings regarding such charge(s), including any conviction(s) . . . or disposition(s), if applicable, and place such information in the control of a person within the office designated to retain control over expunged records."

The order stated:

> IT IS FURTHER ORDERED that any of the above officers or agencies which sent fingerprints and/or any records of the above arrest/conviction/adjudication/ disposition and proceedings to the Federal Bureau of Investigation or any other office or agency shall notify same of this Order and that the agencies designated to retain such records take sufficient precautions to insure that such records and information are not released.

9

IT IS FURTHER ORDERED that any records, or the information therein, shall not be released except as provided under . . . N.J.S.A. 2C:52-1 et seq., and that the persons designated to retain control over expunged records take sufficient precautions to insure that such records and information are not released.

IT IS FURTHER ORDERED that in response to requests for information or records, the court office or law enforcement agency shall reply with respect to the arrest/conviction/adjudication/disposition, which is the subject of this Order, that there is no record.

IT IS FURTHER ORDERED that the arrest/conviction/adjudication/disposition, which is the subject of this Order, shall be deemed not to have occurred, and the Petitioner may answer accordingly any question relating to this occurrence pursuant to N.J.S.A. 2C:52-27.

The Order did not mention Jersey City, the JCPD, the HCPO, or the Hudson County Superior Court. Neither the Sussex County Superior Court, nor the State Police, nor the SCPO notified Jersey City or the JCPD of the order. Defendants' counsel certified that he learned of the order in December 2022, when JCPSOA's counsel brought it to his attention.[2] The parties then agreed to temporarily seal the trial court docket.

---

[2] The JCPSOA, as defendant-intervenor, joins defendants' arguments before this Court. For the remainder of this opinion, we refer to them jointly as defendants.

The trial court denied plaintiff access to the IA report. Although defendants offered to submit the eleven-page report "under seal for in camera review," the court declined the invitation. Instead, it found, based on the representations of defendants' counsel, that "[t]he I.A. report itself is comprised largely of facts and information about the employee officer arrest, conviction, the adjudication, [and] disposition including one verbatim passage from the state investigative reports."

The court noted that the State Police was "specifically named in the expungement order." It reasoned that when the State Police "sent any records of the above arrest, conviction, adjudication, disposition, proceedings . . . defendants became one of the other agencies within the order charged with the duty" to expunge. Hence, defendants were "subject to both the expungement order [and] N.J.S.A. 2C:52-30." The court held that it need not undertake any Rivera balancing because "the expungement order" was a "concrete wall that [it] hit." It ordered the entire docket to remain permanently sealed.

Plaintiff appealed. The Appellate Division reversed and remanded as to both the IA report and the sealing of court documents.

The Appellate Division began by noting that IA reports are not criminal records and are not listed as expunged records under N.J.S.A. 2C:52-1(b). But, it held, "[a]n IA report can reference or include documents covered by

11

N.J.S.A. 2C:52-1(b)."  Nonetheless, the appellate court read the good cause exception in N.J.S.A. 2C:52-19, which the parties had not raised, to require the trial court to "analyze[] the facts of this case by applying Loigman and Rivera."  The appellate court remanded to the trial court to conduct that balancing in the first instance but stated that, "based on the record before us, none of the six Loigman factors appear to favor non-disclosure."

As to the sealing of court documents, the Appellate Division concluded the trial court "should not have sealed the entire file without finding good cause to overcome the strong presumption of public access to court records." It directed the court, on remand, to undertake the analysis required by Rules 1:2-1(c) and 1:38-11 and Hammock "before deciding whether to seal" any specific document.

We granted defendants' petition for certification.  259 N.J. 502 (2025). We maintained the amicus curiae status of the American Civil Liberties Union of New Jersey (ACLU), and granted leave to appear as amici curiae to the Attorney General; the New Jersey State League of Municipalities and New Jersey Institute of Local Government Attorneys (jointly, League of Municipalities); the Municipal Clerks' Association of New Jersey, Inc.; and the Office of the Public Defender.

## II.

Defendants argue that the confidentiality obligations set forth in both the expungement order and the expungement statute prohibit them from releasing the IA report. According to defendants, "[t]he applicability and effect of the Expungement Statute are clear on its face," and "bind[] all law enforcement agencies" that possessed materials covered by the expungement order when it was entered. Defendants aver that the "expansive" language of N.J.S.A. 2C:52-15 and -30 presents "an absolute bar to law enforcement agencies giving any response that would reveal or confirm the existence of an expunged criminal matter." The expungement statute must control and cannot be a mere factor in common law balancing, defendants contend, because "the will of the Legislature, as expressed by statute, must trump any conflicting court-created law." Defendants further submit that the trial court's decision to permanently seal the court records was required by the expungement statute.

The Municipal Clerks' Association asserts that the Appellate Division's decision threatens municipal clerks with criminal liability if they do not correctly undertake the "intricate" common-law analysis or "fall short" on "complicated balancing tests" that challenge even experienced judges.

Plaintiff argues that the expungement statute does not apply to IA reports because it "does not expunge separate administrative or civil records

13

that flow from conduct that also resulted in an expunged criminal charge." That the JCPD "happens to be a law enforcement agency" makes no difference, plaintiff maintains, because the JCPD "was in no way involved in [the lieutenant's] criminal matter." Even if the expungement statute were to apply to the JCPD's IA report, plaintiff submits, Rivera requires that it represent only one factor in a common law balancing test. Therefore, plaintiff requests that we affirm the Appellate Division's judgment.

The ACLU asserts the expungement statute is "largely irrelevant" to this case because IA reports are "not among the . . . records that the [statute] shields" and because "sheltering a police department from accountability . . . is not among the [statute's] purposes." The Public Defender contends that IA records are not covered by the expungement statute because they are not "related to a criminal case" and that access to such records "facilitates discovery of exculpatory and impeachment evidence."

The Attorney General reasons that "expungement orders do not categorically bar disclosure of related IA reports" but do "require redaction" from the reports of "any information revealing the existence of the expunged criminal proceedings." The Attorney General proposes a three-step process for evaluating common law requests for "IA report[s] pertaining to misconduct that also gave rise to criminal proceedings":

14

First, redact any portions of the IA report that would reveal the existence of the expunged criminal proceeding if disclosed, bearing in mind that the conduct underlying the criminal proceeding can be disclosed if separable from information about the criminal proceeding itself. . . . Second, considering the information remaining in the redacted report, balance the competing interests for and against disclosure, consistent with Rivera. Third, if that balance tips towards disclosure, redact . . . information [as required by Rivera] before finally disclosing the duly redacted report.

The League of Municipalities urges a similar procedure in which trial courts conduct an in camera review "to determine whether the IA report contains expunged records and information" and then "redact any and all records and information that have been expunged as well as any language that could confirm or imply that there is an expungement order or evince that there are any records of an arrest, or conviction."

III.

A.

We review questions of statutory interpretation de novo. W.S. v. Hildreth, 252 N.J. 506, 518 (2023). We look first "to the plain language of the statute," Perez v. Zagami, LLC, 218 N.J. 202, 210 (2014), "ascrib[ing] to the statutory words their ordinary meaning and significance, and read[ing] them in context with related provisions so as to give sense to the legislation as a whole," DiProspero v. Penn, 183 N.J. 477, 492 (2005) (citation omitted).

15

B.

The expungement statute, originally enacted in 1979, aims to provide "relief to the reformed offender who has led a life of rectitude and disassociated himself with unlawful activity." N.J.S.A. 2C:52-32. To do so, it provides for the expungement of certain criminal records. The statute defines expungement as "the extraction, sealing, impounding, or isolation of all records on file within any court, detention or correctional facility, law enforcement or criminal justice agency concerning a person's detection, apprehension, arrest, detention, trial or disposition of an offense within the criminal justice system." Id. at -1(a). "Expunged records shall include complaints, warrants, arrests, commitments, processing records, fingerprints, photographs, index cards, 'rap sheets' and judicial docket records." Id. at -1(b).

The statute details which individuals can apply to have criminal records expunged. See, e.g., id. at -2 to -6. It specifies how petitions for expungement are to be filed. Id. at -5.1, -5.3, -7. And it identifies how law enforcement agencies may object. Id. at -11, -14(b). To facilitate such objections, it requires notice of any petition to the Superintendent of the State Police, the Attorney General, the county prosecutor of any county in which the petitioner was convicted, the police chief of the municipality in which the offense was

16

committed, the chief law enforcement officer of any agency that participated in the arrest, and the warden or superintendent of any facility in which the petitioner was held.  Id. at -10(a).  And it requires that a court granting expungement "transmit the order to the law enforcement and criminal justice agencies which, at the time of the hearing on the petition, possess any records specified in the order."  Id. at -10.1(c).

Defendants rely most heavily on the protective provisions included in N.J.S.A. 2C:52-15(a) and -30.  N.J.S.A. 2C:52-15(a) provides:

> [I]f an order of expungement of records of arrest or conviction under this chapter is granted by the court, all the records specified in said order shall be removed from the files of the law enforcement and criminal justice agencies which, at the time of the hearing of the petition, possess the records and shall be placed in the control of a person who has been designated by the head of each such agency.  That designated person shall, except as otherwise provided in this chapter, ensure that such records or the information contained therein are not released for any reason and are not utilized or referred to for any purpose.  In response to requests for information or records of the person who was arrested or convicted, all officers, departments and agencies shall reply, with respect to the arrest, conviction or related proceedings which are the subject of the order, that there is no record information.

N.J.S.A. 2C:52-30 reads:

> Except as otherwise provided in this chapter, any person who reveals to another the existence of an arrest, conviction or related legal proceeding with knowledge that the records and information pertaining thereto have

17

been expunged or sealed is a disorderly person. Notwithstanding the provisions of section 2C:43-3, the maximum fine which can be imposed for violation of this section is $200.00.

The statute contains several exceptions enumerating when expunged records may continue to be used. See, e.g., id. at -17 (when someone petitions to have a conviction expunged, "[e]xpunged records may be used . . . to ascertain whether [the] person has had prior conviction[s] expunged"); id. at -18 ("Information contained in expunged records may be supplied to the Violent Crimes Compensation Office . . . ."); id. at -20 ("Expunged records may be used by the court in determining whether to grant or deny the person's application for acceptance into a supervisory treatment or diversion program for subsequent charges."). In addition, "where the subject matter of the records of arrest or conviction is the object of" a "subsequent civil or criminal proceeding," "release of the information contained" in the expunged records "may be permitted by the Superior Court upon motion for good cause shown and compelling need based on specific facts." Id. at -19.[3]

_____

[3] In a recent decision, we thoroughly analyzed N.J.S.A. 2C:52-19 and held that the New Jersey Division of Child Protection and Permanency "established good cause and compelling need based on specific facts" to use a father's expunged criminal records during a subsequent "Title 9 abuse and neglect factfinding trial" that was based on the same underlying incident as the expunged criminal records. DCPP v. A.P., 258 N.J. 266, 271 (2024). Before the Appellate Division, no party argued that section 19 was relevant to this

18

Generally, "if an order of expungement is granted, the arrest, conviction and any proceedings related thereto shall be deemed not to have occurred, and the petitioner may answer any questions relating to their occurrence accordingly." Id. at -27. However, "[i]nformation divulged on expunged records shall be revealed by a petitioner seeking employment within the judicial branch or with a law enforcement or corrections agency." Id. at -27(c).

None of the expungement statute's exceptions are applicable here. But taken together, they underscore that "[t]he relief provided by the expungement statute . . . does not include the wholesale rewriting of history." G.D. v. Kenny, 205 N.J. 275, 294-95 (2011). Indeed, as we have previously explained,

> the expungement statute does not transmute a once-true fact into a falsehood. It does not require the excision of records from the historical archives of newspapers or bound volumes of reported decisions or a personal diary. It cannot banish memories. . . . Although our expungement statute generally permits a person whose record has been expunged to misrepresent his past, it does not alter the metaphysical truth of his past, nor does it impose a regime of silence on those who know the truth.

---

case. And all here agree that it is not relevant because "the subject matter of the records of arrest or conviction," i.e., the August 2019 incident, is not the "object of" any "subsequent civil or criminal proceeding." N.J.S.A. 2C:52-19. This case is about access to an IA report, not the August 2019 incident. The Appellate Division therefore erred in relying on section 19.

19

[Id. at 302.]

C.

The Internal Affairs Policy and Procedures manual was originally issued by the Attorney General in 1991 to establish "a comprehensive process to address complaints of police misconduct." Rivera, 250 N.J. at 142. It has been amended nine times since, most recently in 2022. The goal of the policy is to "assure the people of New Jersey that complaints of police misconduct are properly addressed." 2019 IAPP § 1.0.1.[4]

Internal affairs investigations determine whether there was a violation of any "law; regulation; directive, guideline, policy, or procedure issued by the Attorney General or County Prosecutor; agency protocol; standing operating procedure [(SOP)]; rule; or training." Id. § 2.2.3(a), (c). While some IA investigations "involve potential criminal conduct," id. § 1.0.6, "[t]he vast majority . . . will be limited to alleged disciplinary infractions," id. § 8.0.6.

For "[s]erious allegations of officer misconduct" that result in both a criminal investigation and an IA investigation, the two investigations "should be kept separate to the extent possible." Id. § 8.1.2. The criminal investigation generally proceeds first, with the IA investigation completed

---

[4] We quote the 2019 IAPP because it was the version in force at the time of the IA investigation in this case.

20

afterwards.  See id. §§ 6.1.3 ("[O]rdinarily, internal affairs investigators should stay their own inquiry pending the resolution of the criminal matter."); 8.1.4.

"Under no circumstances shall an internal affairs administrative investigation be closed merely because a criminal investigation was declined or terminated" without a finding of guilt beyond a reasonable doubt.  Id. § 6.3.8.  Instead, "the internal affairs investigator must continue the administrative investigation to determine whether evidence exists or can be developed that meets the 'preponderance of the evidence' burden of proof for" IA proceedings.  Ibid.

If an allegation of misconduct is sustained, the IA report "must cite the agency rule, regulation, or SOP [that was] violated."  Id. § 9.1.2.  Potential forms of discipline include civil rather than criminal penalties:  "[o]ral reprimand or performance notice," "[w]ritten reprimand," "[s]uspension without pay," "[l]oss of a promotional opportunity," "[d]emotion," "discharge from employment," and in certain cases, a "[m]onetary fine" "in lieu of a suspension."  Id. § 2.2.6.

In 1996, the Legislature enacted N.J.S.A. 40A:14-181, requiring "[e]very law enforcement agency" to "adopt and implement guidelines which shall be consistent with the guidelines governing the [IAPP]."  For many years,

both before and after 1996, the IAPP provided that the results of IA investigations were "confidential information" that could only be "released or shared" under specific circumstances. 2019 IAPP § 9.6.1; see also 1991 IAPP at 15.

In Rivera, we analyzed N.J.S.A. 47:1A-9(b), which provides that OPRA "shall not abrogate or erode any executive or legislative privilege or grant of confidentiality heretofore established or recognized by . . . statute . . . which . . . may duly be claimed to restrict public access to a public record or government record." We held that because the IAPP's confidentiality provisions were a grant of confidentiality established by the executive and "effectively recognize[d]" by statute when the Legislature enacted N.J.S.A. 40A:14-181, IA reports were exempt from public disclosure under OPRA. Rivera, 250 N.J. at 141-43.

However, we held that IA reports "can and should be disclosed under the common law right of access when interests that favor disclosure outweigh concerns for confidentiality." Id. at 135. We recognized that the six factors set forth in Loigman "focus[ed] primarily on the State's interest in preventing disclosure." Id. at 144. Those factors are: (1) whether disclosure "will impede agency functions by discouraging citizens from providing information to the government"; (2) "the effect disclosure may have upon persons" who

22

gave information to the government; (3) "the extent to which agency self-evaluation, program improvement, or other decisionmaking will be chilled by disclosure"; (4) "the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers"; (5) "whether any findings of public misconduct have been insufficiently corrected"; and (6) "whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials." Loigman, 102 N.J. at 113.

We therefore set forth five additional factors that may "heighten[]" the public interest in disclosure of IA reports: (1) "the nature and seriousness of the misconduct"; (2) "whether the alleged misconduct was substantiated"; (3) "the nature of the discipline imposed"; (4) "the nature of the official's position"; and (5) "the individual's record of misconduct." Rivera, 250 N.J. at 147-48. In so doing, we specified that findings of "serious or repeated misconduct" or "more serious discipline" for any officer, or "[w]rongdoing by high-level officials," would all create a strong interest in disclosure. Id. at 148.

We noted that trial courts can "best assess any potentially legitimate confidentiality concerns by reviewing the [IA] report in camera and making appropriate redactions." Id. at 150. But we cautioned that judges should "[a]t

23

a minimum" redact: (1) "names of complainants, witnesses, informants, and cooperators, as well as information that could reasonably lead to the discovery of their names," (2) "non-public, personal identifying information about officers and others, such as their home addresses and phone numbers," and (3) "personal information that would violate a person's reasonable expectation of privacy if disclosed, such as medical information." Ibid.

After our decision in Rivera, the Attorney General amended the IAPP to require that a new IA "Summary and Conclusions Report" be prepared and be disclosed to "any member of the public or press" "under the common law right of access" in certain circumstances. 2022 IAPP §§ 9.1.1(b), 9.6.2(a). Those circumstances include: when an officer is terminated, demoted, or suspended for more than five days; when an officer is "charged with any indictable crime"; or when there is a sustained finding that an officer engaged in "discrimination or bias," "utilized excessive force," "was untruthful," "filed a false report," "intentionally conducted an improper search, seizure or arrest," "intentionally mishandled or destroyed evidence," or engaged in domestic violence. Id. §§ 9.6.2(a)(1), 9.11.2.

The 2022 IAPP provides that before the Summary and Conclusions Report is disclosed, a significant amount of information must be redacted, including the "names of complainants, witnesses, victims and cooperators";

24

"[n]on-public, personal identifying information," including "home addresses, phone numbers, dates of birth, social security numbers, familial relationships, etc."; "[m]edical information or history"; and "[a]ny other information that would violate a person's reasonable expectation of privacy." Id. § 9.6.2(b).

## IV.

We hold that the expungement statute does not categorically bar the release of IA reports. It does, however, bar the release of any information included in an IA report that would reveal an expunged arrest, conviction, or related proceeding. Therefore, we remand to the trial court to redact any information included in the IA report concerning the lieutenant's arrest, charges, conviction, and disposition. Once that information has been redacted, the trial court must conduct the common law balancing test on the remainder of the report, weighing whether "interests that favor disclosure outweigh concerns for confidentiality" in the already-redacted report. Rivera, 250 N.J. at 135. If the court concludes that they do, it must then redact any additional information required by Rivera and release the report to plaintiff. We do not disturb the Appellate Division's judgment as to the sealing of court documents.

## A.

We begin with the definitions in N.J.S.A. 2C:52-1. Internal affairs reports are not themselves "records . . . concerning a person's detection,

25

apprehension, arrest, detention, trial or disposition of an offense within the criminal justice system." N.J.S.A. 2C:52-1(a). They are not "complaints, warrants, arrests, commitments, processing records, fingerprints, photographs, index cards, 'rap sheets' and judicial docket records." Id. at -1(b). They are therefore not themselves "[e]xpunged." Ibid. The JCPD, however, is a "law enforcement . . . agency." Id. at -1(a). Therefore, any expunged records it possesses "concerning a person's detection, apprehension, arrest, detention, trial or disposition of an offense within the criminal justice system" must be "extract[ed], seal[ed], impound[ed], or isolat[ed]." Ibid. That would include any "complaints, warrants, arrests, commitments, processing records, fingerprints," and other materials specified in N.J.S.A. 2C:52-1(b) that the JCPD received from the State Police or the SCPO.

We turn next to the protective provisions relied upon by defendants: N.J.S.A. 2C:52-15 and -30, quoted above. Although neither bars the release of IA reports in general, both bar the release of any information about an expunged arrest, conviction, or related criminal proceeding that may be contained in such a report.

Both provisions, by their terms, apply to "arrests," "convictions," and "related proceedings which are the subject of the [expungement order]" or "related legal proceeding[s]" -- i.e., criminal proceedings. N.J.S.A. 2C:52-15

and -30. An IA report is not a report of an arrest or criminal conviction. Nor is it a criminal proceeding, legal or otherwise, related to an arrest or conviction. Instead, IA investigations determine whether there was a violation of agency rules, regulations, or standard operating procedures for the purpose of imposing "progressive discipline," not criminal punishment, 2019 IAPP § 2.2.6.

The IAPP's explanation of an IA investigation and an IA report accord with what we know of the IA report in this case. Although the report is not in the record and has not been reviewed by any court, we know from the JCPD's major discipline report that it relates to violations of "JCPD Rules and Regulations for[:] Conduct, Mishandling of a Firearm, Intoxicants Off Duty." That is not an arrest, conviction, or any criminal proceeding related thereto.

Nonetheless, the JCPD is a "law enforcement . . . agenc[y]" that "possess[ed]" expunged records at the time the order was entered within the meaning of N.J.S.A. 2C:52-15(a). And it would therefore be a "person" prohibited from "reveal[ing] to another the existence of an arrest, conviction or related legal proceeding with knowledge that the records and information pertaining thereto have been expunged" within N.J.S.A. 2C:52-30.[5]

---

[5] We note that under the notice provisions of the expungement statute, a municipal law enforcement agency will ordinarily not receive a copy of an

27

Therefore, taken as a whole, N.J.S.A. 2C:52-15 and -30 require the JCPD to (1) remove all criminal records specified in the August 30, 2022 expungement order from its files; (2) "ensure that such records or the information contained therein" about the expunged arrest, conviction, or related proceedings are not "released for any reason and are not utilized or referred to for any purpose"; (3) reply that there is "no record information" in response to a request "for information or records" about an expunged "arrest, conviction, or related proceedings"; and (4) refrain from revealing "the existence" of the expunged arrest, conviction, or related legal proceeding.

The JCPD need not, however, refrain from revealing information about the underlying incident that led to both the lieutenant's arrest and its IA investigation. And it need not refrain from revealing information about its IA investigation into whether JCPD rules or regulations were violated.

---

expungement order if it did not participate in the arrest and the offense did not take place in its municipality. See N.J.S.A. 2C:52-10, -10.1. That is why the JCPD was not listed on the expungement order in this case and never received official notice of it. Instead, defendants happened to learn of the expungement order, months after it was issued, from counsel for JCPSOA. Liability under N.J.S.A. 2C:52-30 requires "knowledge that the records and information pertaining thereto have been expunged or sealed." In the ordinary course, a police or municipal employee will likely lack such knowledge unless their agency was explicitly listed on an expungement order or formally notified of it.

Our reading of sections 15 and 30 to bar the release of any information about an expunged arrest, conviction, or related proceeding, but, in this circumstance, not to bar the JCPD's release of information about the underlying incident or its IA investigation into that incident, is supported by the text of section 27. "[I]f an order of expungement is granted," N.J.S.A. 2C:52-27 deems only "the arrest, conviction and any proceedings related thereto . . . not to have occurred." It makes no reference to the underlying incident.

And it is consistent with our prior precedent, which has emphasized that "[t]he relief provided by the expungement statute . . . does not include the wholesale rewriting of history," G.D., 205 N.J. at 294-95, and "does not alter the metaphysical truth" about the past, id. at 302.

We reach the same conclusion regarding the August 30, 2022 expungement order. Although that order did not expunge the JCPD IA report, it did expunge any records the JCPD possesses related to the lieutenant's "arrest/conviction/adjudication/disposition," and it prohibits the JCPD from disclosing any information about same.

Recall that the expungement order did not name the JCPD or Jersey City. It did not mention any IA report. Instead, it directed the Superintendent of the State Police Expungement Unit, the Sussex County Prosecutor, and

29

other specified court and law enforcement agencies to "remove from their records all information relating to" the lieutenant's August 2019 arrest and criminal charges, and the subsequent criminal proceedings "regarding such charge(s)," including any conviction or disposition.

The expungement order further required that: (1) any agency that sent records of the "above arrest/conviction/adjudication/disposition" to any other law enforcement agency "shall notify same of this Order"; (2) any expunged "records, or the information therein, shall not be released except as provided under" the expungement statute; (3) "in response to requests for information or records, the . . . law enforcement agency shall reply with respect to the arrest/conviction/adjudication/disposition, which is the subject of this Order, that there is no record"; and (4) the "arrest/conviction/adjudication/disposition, which is the subject of this Order, shall be deemed not to have occurred."

As certified by defendants' counsel, both the State Police and the SCPO sent the JCPD records that were later expunged. Neither sent any notice of the August 30, 2022 expungement order to the JCPD. The JCPD, however, learned about the order during this litigation. At that point, it became barred from releasing any information about the lieutenant's criminal "arrest/ conviction/adjudication/disposition." It remains so barred.

30

For those reasons, we hold that the expungement statute does not categorically bar the release of IA reports. The expungement order in this case likewise did not categorically bar the disclosure of the requested IA report. However, once the JCPD became aware of the order, both the statute and the order barred and continue to bar defendants from releasing any information about the lieutenant's expunged arrest, conviction, or any related criminal proceeding.

B.

We reject the argument of plaintiff and amici that even if the expungement statute expressly prohibits JCPD from releasing any information about the lieutenant's expunged arrest, conviction, or related proceeding, a court could still order such information released if the common law "balancing weigh[ed] in favor of disclosure."

Plaintiff relies heavily on our statements in Rivera that "[s]tatutes and regulations can also factor into the balancing process but do not determine its outcome," and "[e]xpressions of executive or legislative policy can weigh very heavily in the analysis, but they are not dispositive." 250 N.J. at 144-45 (citing Home News v. Dep't of Health, 144 N.J. 446, 455 (1996); S. N.J. Newspapers, Inc. v. Township of Mount Laurel, 141 N.J. 56, 76 (1995); Higg-A-Rella, Inc. v. County of Essex, 141 N.J. 35, 48 (1995)).

31

But plaintiff overreads those two sentences. We have long held that the common law, a "collection of judicially crafted principles," cannot trump legislation, which "reflects the will of the people as enacted through their" democratically elected representatives. Farmers Mut. Fire Ins. Co. of Salem v. N.J. Prop.-Liab. Ins. Guar. Ass'n, 215 N.J. 522, 545 (2013) (citing United States v. Schooner Peggy, 5 U.S. (1 Cranch) 103, 110 (1801)). Instead, only the Constitution "is paramount to" legislation. Ibid. In other words, "[a] statute does not stand in an inferior status to the common law. Rather, a statute must be honored unless constitutionally infirm." Id. at 528.

Neither Rivera nor any of the cases it cited is to the contrary, because none held that information could be released under the common law even if its disclosure was explicitly barred by statute. Indeed, none of the cases involved a statute that expressly prohibited the release of the information sought.

In Rivera, no statute barred the disclosure of IA reports. None mentioned disclosure of IA reports at all. Instead, the IAPP provided that IA materials were generally confidential, and the Legislature enacted a statute, N.J.S.A. 40A:14-181, directing law enforcement agencies to "adopt and implement guidelines" consistent with the IAPP. Rivera, 250 N.J. at 143 (quoting N.J.S.A. 40A:14-181). Although, as earlier noted, we held that constituted an executive grant of confidentiality sufficiently recognized by

statute to exempt IA reports from disclosure under OPRA's section 9(b), id. at 141-43 (citing N.J.S.A. 47:1A-9(b)), it was not an express statutory bar. Indeed, the Legislature has not codified the many instructions included in the original IAPP of 1991, which ran thirty-one pages without attachments, or the many that have been added since -- the current 2022 IAPP is seventy pages without attachments.

In Home News, we held that under the common law, a registrar could not redact a five-year-old boy's cause of death -- likely, homicide -- from a death certificate despite a Department of Health Regulation, N.J.A.C. 8:2A-1.2, which provided that cause-of-death information would generally be omitted. 144 N.J. at 450-51, 456. But the statutes at issue required confidentiality of medical information only for people with AIDS, cancer, and birth defects -- not for victims of homicide. Id. at 451, 456. There was thus no statutory bar to disclosure.

In Southern New Jersey Newspapers, we remanded to the trial court to conduct a common law balancing of a newspaper's interest in obtaining firearm-purchase permits and applications for same despite a regulation promulgated by the Attorney General, while the litigation was pending, exempting such records from public disclosure. 141 N.J. at 68, 75. In so doing, we explained that the regulation was "not dispositive" but was "a

33

significant factor to be weighed in the [common law] balancing process."  Id.

at 76; see also ibid. ("In our view, the Attorney General's regulatory

expression of the importance of confidentiality weighs very heavily, but not

conclusively, in the balancing process.").  However, as to a mental health form

submitted as part of the application, we remanded for the trial court to consider

whether disclosure was prohibited by statute.  Id. at 78-79 (citing N.J.S.A.

30:4-24.3).  We did not state or suggest that access could be granted under the

common law even if barred by statute.  Ibid.  Finally, in Higg-A-Rella, there

was no statute that was even alleged to bar access.  See 141 N.J. at 48

(discussing only the Right-to-Know Law).

One of the "most basic principles of our democratic form of

government" is that statutes are not "subservient to the common law when the

two are in conflict with each other."  Farmers Mut., 215 N.J. at 545.  The

expungement statute bars a law enforcement agency from releasing any

information that would reveal an arrest, conviction, or related proceeding that

it knows has been expunged.  We must respect and enforce the Legislature's

judgment.

## C.

As the Appellate Division explained, pursuant to Rules 1:2-1(c) and

1:38-11 and Hammock, a trial court may seal court documents only after it has

"examin[ed] each document individually and ma[de] factual findings with regard to why the presumption of public access has been overcome." Hammock, 142 N.J. at 382. We do not disturb that conclusion.

V.

Counsel for defendants has certified that the IA report in this case contains "information pertaining to [the lieutenant's] arrest, charges and [the] disposition" of his criminal case. On remand, the trial court should review the IA report in camera and redact any such information. It should then conduct the common law balancing test on the remainder of the report, weighing whether "interests that favor disclosure outweigh concerns for confidentiality" in the redacted report. Rivera, 250 N.J. at 135. If the court concludes that they do, it must redact any additional information required by Rivera and release the report to plaintiff. We do not disturb the Appellate Division's judgment as to the sealing of court documents. For the reasons stated, we affirm as modified the Appellate Division's judgment and remand to the trial court.


JUSTICES PATTERSON, PIERRE-LOUIS, FASCIALE, NORIEGA, and HOFFMAN join in JUSTICE WAINER APTER's opinion. CHIEF JUSTICE RABNER did not participate.

35